**MEDINOL LTD., Plaintiff,**

v.

**GUIDANT CORP. and Advanced Cardiovascular Systems, Inc., Defendants.**

**No. 03 Civ. 2604(SAS).**

United States District Court, S.D. New York.

Feb. 15, 2006.

See also 2005 WL 3535062.

---

Keith R. Hummel, Rory O. Millson, Fabian D. Gonell, Cravath, Swaine & Moore LLP, New York, NY, Christopher A. Hughes, Richard C. Komson, Dorothy R. Auth, Morgan & Finnegan, LLP, New York, NY, for Plaintiff.

J. Michael Jakes, Christine E. Lehman, Robert F. Shaffer, Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Washington, DC, R. Scott Garley, Oren Warshavsky, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Medinol Ltd. ("Medinol") brings this action for damages and injunctive relief relating to the alleged infringement by Guidant Corp. and its subsidiary Advanced Cardiovascular Systems, Inc. (collectively, "Guidant") of certain of Medinol's patents.[1] Medinol moves for summary judgment based on literal infringement of two of the three patents-in-suit, the '120 Patent and the '381 Patent. Guidant responds with its own motion for summary judgment, asserting that the accused products infringe

none of the patents-in-suit, either literally or under the doctrine of equivalents. For the following reasons, Medinol's motion is granted with respect to the '381 Patent and denied with respect to the '120 Patent; and Guidant's motion is granted except with respect to the '381 Patent. In short, Guidant's accused products literally infringe Medinol's '381 Patent.[2]

## II. BACKGROUND

Medinol, based in Tel Aviv, Israel, designs and manufactures coronary stents.[3] The company was founded by, among others, Dr. Jacob ("Kobi") Richter, Medinol's Chairman of the Board and Chief Technical Officer.[4] Guidant develops, markets, and sells cardiovascular medical products and has its principal place of business in Indiana. ACS is based in California.[5]

The general background of the stent technology at issue here has been adequately covered by my prior Opinions in this case.[6] Familiarity with these Opinions is assumed.

### A. The Patents–in–Suit

According to Richter, stents on the market in the early 1990's all possessed advan-

---

1. At issue are U.S. Patent Nos.: (1) 5,843,120 ("'120 Patent"); (2) 6,443,982 ("'982 Patent"); and (3) 6,461,381 ("'381 Patent") (collectively, "patents-in-suit"). Medinol alleges that Guidant has willfully infringed the patents-in-suit through the alleged manufacture, use, offer for sale, sale, and/or importation of the Multi–Link PENTA, ZETA, VISION and MINI–VISION coronary stent systems ("Penta," "Zeta," "Vision," and collectively, the "accused products"), which contain stents for implantation in human vessels.

2. However, the patents-in-suit could yet be deemed invalid. I recently denied Guidant's motion for summary judgment on its still-pending counterclaim of patent invalidity. See generally Medinol Ltd. v. Guidant Corp., 412 F.Supp.2d 301, No. 03 Civ. 2604, 2005

WL 3535062 (S.D.N.Y. Dec. 27, 2005) ("Medinol III").

3. See Amended Complaint ("Complaint") ¶ 5.

4. See Medinol III, 412 F.Supp.2d at 304, 2005 WL 3535062, at *1.

5. See Complaint ¶¶ 6–7.

6. See Medinol III, 412 F.Supp.2d at 301–310, 2005 WL 3535062, at **1–4; Medinol Ltd. v. Guidant Corp., No. 03 Civ. 2604, 2004 WL 2210290, at **1–3 (S.D.N.Y. Sept. 30, 2004) ("Medinol II") (claim construction opinion); Medinol Ltd. v. Guidant Corp., 341 F.Supp.2d 301, 304–06 (S.D.N.Y.2004) ("Medinol I") (granting in part and denying in part Guidant's motion for summary judgment on collateral estoppel grounds).

tages and offsetting disadvantages, because they:

> were of two extreme kinds ..., [o]ne was very flexible ... but because it was very flexible, also when it was extended it was not stable. The loops could be drawn away from each other, and it would not support very well the lesion, the narrowing in the vessel. So, it could go anywhere you want [within the body], but would not support. The other type had a rigid enough, stable enough structure such that when deployed, it would support pretty well, but it was very inflexible, rigid. So you could not push it through the curves of the arterial system to the position you are trying to treat. That was suboptimal.[7]

7. *Medinol III*, 412 F.Supp.2d at 308, 2005 WL 3535062, at *3 (quoting Trial Testimony of Jacob Richter at 73–76, *Medinol Ltd. v. Boston Scientific Corp.*, 01 Civ. 2881(AKH) (S.D.N.Y.) ("BSC Trial Testimony")).

8. *See* '373 Patent, title page.

9. In addition to the patents listed *supra* at note 1, these include U.S. Patent No. 5,733,-303 to Israel ("the '303 Patent") and U.S. Patent No. 5,972,018 to Israel ("the '018 Patent"). *See* Amended Complaint ¶¶ 11, 15.

On September 12, 1995, U.S. Patent No. 5,449,373 was issued to Gregory Pinchasik et al. and assigned to Medinol (" '373 Patent"). The application for this patent was filed on March 17, 1994.[8] A series of stents, described as continuations or continuations-in-part of this patent, were invented by Henry Israel and Pinchasik, and assigned to Medinol. These patents—the '303, '018, '120, '381, and '982[9]—describe a family of flexible, expandable stents that "achieve the objectives and flexibility during delivery, compensation for foreshortening, continuous uniform scaffolding, and resistance to radial deformation and collapse upon expansion."[10] Preferred embodiments of the patents-in-suit, taken from the '381 Patent, are shown below:[11]

10. *Scimed Life Sys., Inc., v. Johnson & Johnson*, 225 F.Supp.2d 422, 425 (D.Del.2002). "Foreshortening" refers to the tendency of a stent to contract longitudinally as it expands, while "uniform scaffolding" refers to a stent that after expansion is "very smooth ... continuously pushing the vessel, [and] not letting pieces of the vessel wall protrude between [ ] struts." *Medinol III*, 412 F.Supp.2d at 309, n. 46, 2005 WL 3535062, at *4 n. 46 (citation omitted).

11. '381 Patent, Figs. 1–2, 7–8.

FIG. 1

286

*FIG. 2*

**U.S. Patent** Oct. 8, 2002 Sheet 6 of 6 **US 6,461,381 B2**

FIG. 7

FIG. 8

Although Medinol originally alleged infringement of claims from all five of these patents, it has now dropped its infringement allegations pertaining to the '303 and '018 Patents.[12] The remaining claims

12. *See Medinol III*, 412 F.Supp.2d at 309, 2005 WL 3535062, at *4 (citation omitted).

can be divided into two groups: the "meander" claims and the "flexible cell" claims. The "meander" claims, comprised of the asserted claims of the '120 and '982 Patents, describe stent structures formed by two types of meander patterns intertwined with one another. These patterns are referred to as "first meanders," which extend in a circumferential direction; and "second meanders," which extend in a longitudinal direction.[13] I have construed "first meander" to mean "a periodic sinusoidal pattern about a center line."[14] I construed a "second meander" to mean "periodic pattern[s] about a center line oriented in a direction different from the axis of the first meanders."[15]

The "flexible cell" claims refer to the asserted claims of the '381 Patent. A "flexible cell," as used in these claims, has been construed as "[a]n arrangement of structural elements that defines an enclosed space. The cells must be substantially flexible prior to expansion of the stent and substantially rigid after expansion of the stent."[16]

## B. The Asserted Claims of the Patents–in–Suit

### 1. The '120 Patent

The United States Patent and Trademark Office ("PTO") issued the '120 Patent, entitled "Flexible–Expandable Stent," on December 1, 1998. Five of the claims are asserted here—13, 16, 18, 27, and 28, which, in seriatim, state:

13. An expandable stent formed of an elongated cylindrical unitary tube suitable for insertion into a lumen or blood vessel in which it may be expanded, comprising: a plurality of first meanders extending in a first direction on the cylinder of the tube and a plurality of second meanders extending in a second direction, on the cylinder of the tube, wherein the first and second meanders are formed with loops and are interconnected such that at least one of the loops of each of the first meanders is disposed between each consecutive second meander to which the first meander is connected, and at least one of the loops of each of the second meanders is disposed between each consecutive first meander to which it is connected; the first and second meanders defining a plurality of enclosed spaces.

16. A stent according to claim 13, wherein the first and second meanders are connected together such that the loops thereof cooperate so that upon bending of the stents the loops change shape to compensate for the difference in length between the inside and outside curves.

18. A stent according to claim 13, wherein the stent can bend in any direction and in more than one direction at any time.

27. A stent according to claim 21 wherein said second meander patterns intersect with said first meander patterns so as to leave at least one loop of said first meander patterns between each pair of adjacent second meander patterns.

28. A stent according to claim 21 wherein said second meander patterns intersect with said first meander pat-

---

13. "Circumferential" in this context means the material comprising the rings of the stent; while "longitudinal" describes an element that runs for some distance along the length of the stent.

14. See Medinol II, 2004 WL 2210290, at *13.

15. Id. Meander patterns need not be orthogonal to one another. See id. at *6.

16. Id. at *9.

terns at common members which are shared by said first and said second meander patterns.[17]

## 2. The '982 Patent

On September 3, 2002, the PTO issued the '982 Patent. Claims 1, 2–15, and 17 are asserted here and read as follows:

1. An expandable stent for supporting a vessel, wherein in the expanded and deployed state, the stent consists of:

(a) first meander patterns having loops, the first meander patterns being longitudinally spaced from each other and having axes extending in a first direction; and

(b) second meander patterns having loops, the second meander patterns having axes extending in a second direction, different than the first direction,

(c) wherein the first and second meander patterns are interconnected to form a tubular structure;

(d) wherein the first meander patterns are connected to the second meander patterns so as to leave at least one loop of each of the second meander patterns in the space between each pair of adjacent first meander patterns; and

(e) wherein the second meander patterns are connected to the first meander patterns so as to leave no more than two loops of each of the first meander patterns between each pair of adjacent second meander patterns.

2. The stent according to claim 1, wherein the shape and placement of the loops provides radial strength to the expanded stent to hold the vessel open.

3. The stent according to claim 2, wherein the first direction extends in a circumferential direction.

4. The stent according to claim 3, wherein the second direction extends in a longitudinal direction.

5. The stent according to claim 2, wherein the second direction extends in a longitudinal direction.

6. The stent according to claim 1, wherein the stent defines a plurality of enclosed spaces, with each longitudinal end of each of the enclosed spaces being formed by one or more loops of the first meander pattern.

7. The stent according to claim 6, wherein the enclosed spaces are substantially the same size.

8. The stent according to claim 7, wherein the first direction extends in a circumferential direction.

9. The stent according to claim 8, wherein the second direction extends in a longitudinal direction.

10. The stent according to claim 7, wherein the second direction extends in a longitudinal direction.

---

17. '120 Patent, col. 7, ll. 13–26; col. 7, ll. 41–45; col. 7–8, ll. 53–55, 1–2; col. 8, ll. 44–47; col. 8, ll. 48–51. Claim 21, referenced by asserted claims 27 and 28, describes:

A stent formed of a tube having a patterned shape, the patterned shape comprising:
a. first meander patterns having axes extending in a first direction;
b. second meander patterns having axes extending in a second direction, different than said first direction, wherein said second meander patterns intersect with said first meander patterns;
c. wherein said first meander patterns have loops;
d. wherein said first meander patterns are spaced apart to leave a portion of said second meander patterns between each pair of adjacent first meander patterns;
e. wherein each of said second meander patterns has at least one loop between at least one pair of adjacent first meander patterns.

*Id.* col. 8, ll. 6–21.

**290**

11. The stent according to claim 6, wherein the first direction extends in a circumferential direction.

12. The stent according to claim 11, wherein the second direction extends in a longitudinal direction.

13. The stent according to claim 6, wherein the second direction extends in a longitudinal direction.

14. The stent according to claim 1, wherein the first direction extends in a circumferential direction.

15. The stent according to claim 14, wherein the second direction extends in a longitudinal direction.

17. The stent according to claim 1 wherein the second direction extends in a longitudinal direction.[18]

### e. The '381 Patent

The '381 Patent was issued on October 8, 2002. Claims 56–58, 61, 63, 65–66, and 68–70, asserted in this action, recite:

56. A balloon expandable stent for implantation into a lumen to support the lumen, said stent both in the unexpanded state and in the balloon-expanded state including: a plurality of flexible cells adjacent to one another both circumferentially and longitudinally each of said flexible cells comprising:

a) a first flexible link including an arc, the first flexible link having a first longitudinal end and a second longitudinal end;

b) a second flexible link including an arc, the second flexible link having a first longitudinal end and a second longitudinal end;

c) a first circumferential member disposed between said first longitudinal end of said first flexible link and said first longitudinal end of said second flexible link and;

d) a second circumferential member disposed between said second longitudinal end of said first flexible link and said second longitudinal end of said second flexible link,

e) at least one of said first circumferential member and said second circumferential member in each of said cells having a portion with a substantial longitudinal component that is also a portion with a substantial longitudinal component of a first circumferential member or a second circumferential member in a longitudinally adjacent cell,

wherein in the expanded state the first and second circumferential members have a substantial longitudinal component to provide coverage of the lumen.

57. A stent according to claim 56, wherein in the unexpanded state, a radial plane perpendicular to a longitudinal axis can pass through the flexible links of the flexible cells and not pass through the circumferential members.

58. A stent according to claim 56 wherein each of said first and second flexible links has ends generally aligned with respect to each other along a longitudinal axis of the stent.

61. A stent according to claim 56, wherein the first members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops and the second members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops.

63. A stent according to claim 56 wherein said plurality of flexible cells

18. '982 Patent, col. 6, ll. 29–67; col. 7, ll. 1–11, 14–15.

provide substantially all the support for said stent.

65. A balloon expandable stent for implantation into a lumen to support the lumen, said stent both in the unexpanded state and in the balloon-expanded state including: a plurality of flexible cells adjacent to one another both circumferentially and longitudinally each of said flexible adjacent cells comprising:

a) a first flexible link including an arc, the first flexible link having a first longitudinal end and a second longitudinal end;

b) a second flexible link including an arc, the second flexible link having a first longitudinal end and a second longitudinal end;

c) a first circumferential member disposed between said first longitudinal end of said first flexible link and said first longitudinal end of said second flexible link and;

d) a second circumferential member disposed between said second longitudinal end of said first flexible link and said second longitudinal end of said second flexible link,

e) at least one of said first circumferential member and said second circumferential member in each of said cells having a portion with a substantial longitudinal component that is also a portion with a substantial longitudinal component of a first circumferential member or a second circumferential member in a longitudinally adjacent cell,

f) wherein said plurality of connected flexible cells imparts radial strength to said stent and coverage of the surface of said lumen in an amount sufficient to support said lumen when said stent is expanded by a balloon from a delivery diameter to a deployment diameter.

66. A stent according to claim 65, wherein in the unexpanded state, a radial plane perpendicular to a longitudinal axis can pass through the flexible links of the flexible cells and not pass through the circumferential members.

68. A stent according to claim 65, wherein the first members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops and the second members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops.

69. A stent according to claim 65 wherein each of said first and second flexible links has ends generally aligned with respect to each other along a longitudinal axis of the stent.

70. A stent according to claim 65 wherein said plurality of flexible cells provide substantially all the support for said stent.[19]

## C. The Accused Products

The accused products are new iterations of Guidant's original Multi–Link stent design, which Guidant asserts was the "first uniformly flexible stent to employ rings and links."[20] The progenitor of the first Multi–Link stent, as well as succeeding stents in this line such as the accused products, was U.S. Patent No. 5,421,955 to Lilip Lau (June 6, 1995) ("Lau Patent"),

19. '381 Patent, col. 9–10, ll. 56–67, 1–18; col. 10, ll. 19–22; col. 10, ll. 23–25; col. 10, ll. 26–27; col. 10, ll. 30–35; col. 10, ll. 38–40; col. 10, ll. 43–67; col. 11, ll. 1–13.

20. Guidant's Memorandum in Opposition to Medinol's Motion for Partial Summary Judgment of Infringement and in Support of Its Motion for Summary Judgment of Noninfringement ("Def. Mem.") at 3.

which teaches different ways of connecting circumferential rings and connectors to form a stent.[21] The Lau Patent, which I have discussed in a previous Opinion,[22] can be summarized as "an expandable stent which is relatively flexible along its longitudinal axis to facilitate delivery through tortuous body lumens, but which is stiff and stable enough radially in an expanded condition to maintain the patency of a body lumen such as an artery when implanted therein."[23]

Guidant adopted Lau's teachings in commercializing the first Multi–Link stent in 1997.[24] However, Guidant asserts that it later moved beyond Lau's serpentine rings "to incorporate features that would provide better flexibility both before and after expansion."[25] Each year after the intro-

duction of the original Multi–Link, Guidant introduced a new stent system, including the Multi–Link Duet in 1998, the Multi–Link Tristar in 1999, and the Multi–Link Tetra in 2000.[26] Prior to the release of the accused products, the Multi–Link stents utilized straight, as opposed to looped, connectors.[27] The switch to looped connectors was the modification that prompted Medinol to accuse Guidant of infringement.[28]

The Penta was introduced in 2001.[29] According to Guidant, "the Penta employs circumferential rings with a unique complex pattern that provides superior flexibility (both before and after expansion), radial strength, radiopacity (the ability to see the stent by angiogram during delivery for precise placement), scaffolding, and conformability."[30] The Penta's circumferen-

---

**21.** See generally U.S. Patent No. 5,421,955 to Lau (June 6, 1995) ("Lau '955 Patent"), Ex. 1 to 8/30/05 Declaration of Robert F. Shaffer, counsel for Guidant. This patent is a continuation of a series of patent applications originally filed on October 28, 1991. See id. col. 1.

**22.** See Medinol III, 412 F.Supp.2d at 306, 2005 WL 3535062, at *2.

**23.** Lau '955 Patent, col. 1, ll. 53–58. "The Lau '955 Patent discloses an invention comprising serpentine rings, connected with straight 'connectors,' or links between rings. The rings may be connected in two ways: out-of-phase (connecting adjacent crowns of rings that face each other) and in-phase (crowns pointing in one direction)." Medinol III, 412 F.Supp.2d at 306, 2005 WL 3535062, at *2 (citations to the Lau Patent omitted).

**24.** See Rule 56.1 Statement of Undisputed Facts in Support of Guidant's Motion for Summary Judgment of Noninfringement ("Def. Noninfringement 56.1") ¶ 10.

**25.** Def. Mem. at 3. Accord Def. Noninfringement 56.1 ¶ 22 (citation omitted) (referring to Guidant documents where the Multi–Link is referred to as a "no-compromise" design).

**26.** See Def. Noninfringement 56.1 ¶¶ 12–14. Guidant asserts that several of the Multi–Link

stents became "market leaders" when introduced, but does not cite admissible evidence for this vague assertion. See id. ¶¶ 10–14, 16.

**27.** See Medinol's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. Infringement 56.1") ¶ 27 (citation omitted). Accord Guidant's Local Rule 56.1 Counterstatement to Medinol's Rule 56.1 Statement of "Undisputed Facts" ("Def. Infringement 56.1") ¶ 27.

**28.** See, e.g., Medinol's Counterstatement of Facts Pursuant to Local Rule 56.1 in Opposition to Guidant's Cross–Motion for Summary Judgment of Noninfringement ("Pl. Noninfringement 56.1") ¶ 15.

**29.** See Def. Noninfringement 56.1 ¶ 16. Guidant created both a "Penta Medium" and "Penta Small" design, but the parties agree that any differences between the two products are immaterial to these motions. See Pl. Infringement 56.1 ¶ 30; Def. Infringement 56.1 ¶ 30.

**30.** Def. Mem. at 4 (citing certain Penta promotion materials ("Penta Materials") at 5–6, 12, Ex. 1 to 10/4/05 Declaration of Robert F. Shaffer, counsel for Guidant ("Shaffer Decl.")).

tial rings are connected by five-turn links, which Guidant refers to as an "Access–Link."[31] "One part of the [circumferential] ring is widened to accommodate the embedded five-turn link ... in addition, the links at the right end of the stent are not curved, but straight."[32]

The Zeta system was introduced in 2002. The only difference between the Penta and Zeta is in the delivery platform, and the parties agree that for present purposes the Penta and Zeta can be analyzed interchangeably.[33]

Finally, the Multi–Link Vision was introduced in 2003. This stent also employs circumferential rings with "a complex pattern, occasionally connected by a substantially straight link with a single turn."[34]

This stent links its circumferential rings with a long connector, straight except for a single U-shaped loop.[35] Guidant refers to the curved portion of this connector as a "Flexalink."[36]

Guidant asserts that a "hallmark" of the Multi–Link family of stents is that they are flexible both before and after expansion.[37] According to Guidant, *post*-deployment flexibility is just as important as *pre*-deployment flexibility, because a stent that does not sufficiently conform to the blood vessel where it is deployed runs the risk of straightening that vessel.[38] Guidant asserts that Medinol only belatedly recognized the importance of post-deployment flexibility, prompting it to upgrade its original NIR stent to a newer NIRFLEX design.[39]

31. *See* Pl. Infringement 56.1 ¶ 41 (citation omitted).

32. Def. Mem. at 4 (citing Penta Materials at 12) (touting the use of straight connectors at the ends of the stent in order to improve retention of the crimped stent on the balloon pre-deployment).

33. *See id.* at 4 n. 2 ("all references herein to the reasons why the pattern of the Penta stent does not infringe apply equally to the Zeta stent"); *see also* Medinol's Memorandum of Law in Support of Its Motion for Summary Judgment of Literal Infringement of the '120 Patent and the '381 Patent ("Pl. Mem.") at 5 n. 2 ("all references to the Penta stent herein are intended to encompass" the Zeta system.). Accordingly, references in this Opinion to the Penta apply equally to the Zeta system.

34. Def. Mem. at 4 (citation omitted). The size differences among the Vision stents are immaterial to these motions. *See* Pl. Infringement 56.1 ¶ 51.

35. *See* Pl. Infringement 56.1 ¶ 54.

36. *See* Def. Infringement 56.1 ¶ 55 (citing Multilink Vision Coronary Stent System ("Vision Brochure") at 20, Ex. 2 to 9/14/05 Declaration of Fabian D. Gonell, counsel for Medinol ("9/14/05 Gonell Decl.")). Medinol

contends that this document shows that the entire link is referred to as a Flexalink, but the Vision Brochure supports Guidant's interpretation.

37. *See* Def. Mem. at 5 (citing trial testimony of Richter in *Scimed Life Sys., Inc. v. Johnson & Johnson*, 225 F.Supp.2d 422 (D.Del.2002) (*"Scimed* Testimony") at 467–68, 470, Ex. 3 to Shaffer Decl.; and BSC Trial Testimony at 436–37, Ex. 4 to Shaffer Decl.).

38. *See, e.g.*, 5/27/05 Warren Sherman Deposition Transcript at 148–49 ("Sherman Dep. Tr."), Ex. 9 to Shaffer Decl. (recounting physician complaints that Medinol's stents, in contrast to the Multi–Link Duet, were insufficiently flexible after deployment and thus tended to straighten blood vessels); Def. Noninfringement 56.1 ¶ 71 (citation omitted) (recounting Richter's deposition testimony discussing physician complaints that Medinol's NIR stent straightened blood vessels once deployed).

39. *See* BSC Trial Testimony at 436–37, 455–58 (Richter, recounting development of the NIRFLEX, which attained better performance than earlier Medinol designs with respect to allowing for vessel curvature after deployment).

## III. LEGAL STANDARD

### A. Standard of Review

■ Federal Circuit precedent governs issues of patent law, while the law of the regional circuit applies to nonpatent issues.[40] Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[41] In determining whether a genuine issue of material fact exists, the court construes the evidence in the light most favorable to the non-moving party and draws justifiable inferences in that party's favor.[42]

### B. Infringement

■ Patent infringement refers to "the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the term of the patent."[43] "Infringement analysis is a two-step process: '[f]irst, the court determines the scope and meaning of the patent claims asserted ... [and second,] the properly construed claims are compared to the allegedly infringing device.' "[44] The patentee must prove infringement by a preponderance of the evidence.[45]

■ To prove infringement, the patentee must show that the accused device meets each claim limitation of the patents-in-suit, either literally or under the doctrine of equivalents.[46] The doctrine of equivalents enables a patent owner to prove infringement, despite a lack of literal infringement, if the differences between the claimed product and the product accused of infringement are insubstantial.[47] Under either theory, infringement is found only when the accused product contains all the limitations of the patent-in-suit.[48]

### C. Claim Construction

■ "When, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation], the question of literal in-

---

**40.** See, e.g., Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed.Cir.2003).

**41.** Fed.R.Civ.P. 56(c). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party,' " and "[a] fact is material when it 'might affect the outcome of the suit under the governing law.' " Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**42.** See, e.g., Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 201 (2d Cir.2004).

**43.** 35 U.S.C. § 271(a).

**44.** North Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335 (Fed.Cir.2005) (quoting Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc) (citation omitted)).

**45.** See Braun, Inc. v. Dynamics Corp., 975 F.2d 815, 819 (Fed.Cir.1992).

**46.** Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314, 1324 (Fed.Cir.2003).

**47.** See Aquatex Indus., Inc. v. Techniche Solutions, 419 F.3d 1374, 1382 (Fed.Cir.2005) (explaining that the doctrine of equivalents "allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.").

**48.** See MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed.Cir.2005) (citation omitted) ("If [ ] even one claim limitation is missing or not met, there is no literal infringement"); see also Kustom Signals, Inc. v. Applied Concepts, Inc., 264 F.3d 1326, 1333 (Fed.Cir.2001) (citing Warner–Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)) ("No claimed element, or an equivalent thereof, can be absent if the doctrine of equivalents is invoked.").

fringement collapses to one of claim construction and is thus amenable to summary judgment."[49] "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' "[50] Claim construction is a question of law, the purpose of which is to determine what is covered by the asserted claims of a patent.[51] In other words, " '[t]he construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.' "[52]

■ When construing patent claims, courts are directed to give primary importance to the "intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history."[53] However, a court may also, as a discretionary matter, receive extrinsic evidence, such as expert testimony, to understand the technical aspects of a patent.[54]

■ Claim terms "are generally given their ordinary and customary meaning."[55] This refers to "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[56] Courts should first consider the "words of the claims themselves . . . to define the scope of the patented invention."[57] The Federal Circuit has noted that in some cases claim construction "involves little more than the application of the widely accepted meaning of commonly understood words" and "in such circumstances, general purpose dictionaries may be helpful."[58] In addition, "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning" of a term.[59]

■ A second source of intrinsic evidence is the patent specification, which contains a "written description of the invention which must be clear and complete

**49.** *Athletic Alternatives, Inc. v. Prince Mf'g, Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996). *Accord Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 988–89 (Fed.Cir.1999).

**50.** *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed.Cir. 2004)).

**51.** *See, e.g., Boss Control, Inc. v. Bombardier Inc.,* 410 F.3d 1372, 1376 (Fed.Cir.2005) (citing *Cybor Corp.,* 138 F.3d at 1456).

**52.** *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001) (quoting *Embrex, Inc. v. Service Eng'g Corp.,* 216 F.3d 1343, 1347 (Fed.Cir.2000)).

**53.** *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). *Accord Phillips,* 415 F.3d at 1314.

**54.** *See Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings,* 370 F.3d 1354, 1360 (Fed.Cir.2004).

**55.** *Phillips,* 415 F.3d at 1312 (citation omitted).

**56.** *Id.* at 1313 (citation omitted). *Accord Metabolite Labs.,* 370 F.3d at 1360 ("normal rules of usage create a 'heavy presumption' that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

**57.** *Vitronics,* 90 F.3d at 1582. *Accord Phillips,* 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").

**58.** *Phillips,* 415 F.3d at 1314 (citing *Brown v. 3M,* 265 F.3d 1349, 1352 (Fed.Cir.2001)).

**59.** *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088 (Fed.Cir.2003). *Accord Phillips,* 415 F.3d at 1314 (citing *Mars, Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1374 (Fed.Cir. 2004)) ("the context in which a term is used in the asserted claim can be highly instructive").

296

enough to enable those of ordinary skill in the art to make and use it."[60] "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims."[61] Indeed, the patent specification is perhaps the "single best guide to the meaning of a disputed term"[62] and may demonstrate whether the patentee "used terms in a manner inconsistent with their ordinary meaning."[63]

■ Courts also examine the prosecution history of the patent, which includes the record of all proceedings relating to the patent that took place before the PTO, "any express representations made by the applicant regarding the scope of the claims," and in some cases an examination of the prior art.[64] Courts use this information to assess whether the patentee made express representations regarding the scope and meaning of the claims to obtain the patent.[65] Generally, the prosecution history can inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether she narrowed the scope of her claims in the course of prosecution.[66] By scrutinizing the prosecution history during

claim construction, courts must "ensure[ ] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."[67]

## D. Doctrine of Equivalents—Prosecution History Estoppel

■ "Equivalence is shown by evidence that the accused device contains an element that is not substantially different from any claim element that is literally lacking, or that the claimed limitation and the accused component perform substantially the same function in substantially the same way to achieve substantially the same result."[68] Equivalency is a question of fact, and as with any summary judgment motion, all reasonable inferences must be drawn in favor of the nonmovant.[69]

■ Prosecution history estoppel is a "legal limitation on the doctrine of equivalents."[70] This doctrine limits the availability of the doctrine of equivalents to the extent that an applicant: (1) makes a narrowing amendment for purposes of patentability (amendment-based estoppel); or (2) clearly and unmistakably surrenders subject matter by arguments made to the

---

60. *Vitronics*, 90 F.3d at 1582. *See also* 35 U.S.C. § 112.

61. *Phillips*, 415 F.3d at 1316.

62. *Metabolite Labs.*, 370 F.3d at 1360.

63. *DeMarini Sports*, 239 F.3d at 1323.

64. *Vitronics*, 90 F.3d at 1582.

65. *See id.*

66. *See Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83). *See also Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed.Cir.2002) ("This court also considers the prosecution history ... to determine whether the applicant clearly and unambiguously disclaimed or disavowed [any

interpretation] during prosecution in order to obtain claim allowance.") (quotation marks and citation omitted).

67. *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed.Cir.2005) (citation omitted).

68. *Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1372 (Fed.Cir.2000) (quotation and citation omitted).

69. *See, e.g., Leggett & Platt, Inc. v. Hickory Springs Mf'g Co.*, 285 F.3d 1353, 1360 (Fed.Cir.2002) (citing *Viskase Corp. v. American Nat'l Can Co.*, 261 F.3d 1316, 1324 (Fed.Cir.2001)).

70. *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1301 (Fed.Cir.2005).

PTO (argument-based estoppel).[71] With regard to argument-based estoppel, the only form of estoppel at issue in this case, an objective test is applied, inquiring "whether a competitor would reasonably believe [from the applicant's arguments to the PTO] that the applicant had surrendered the relevant subject matter."[72]

## IV. DISCUSSION

### A. Claim Construction Disputes

Although I have already construed a dozen terms necessary to the infringement analysis,[73] the parties now dispute the proper interpretation of several phrases used in my claim construction Opinion. The parties agree that my resolution of these additional claim construction disputes will determine the outcome of the pending motions, at least with regard to literal infringement.[74]

### 1. "Sinusoidal"

■■■ I previously held that "first meander" means "a periodic sinusoidal pattern about a center line."[75] In including the term "sinusoidal," I relied on the written description of the patents-in-suit, which "clearly provides that the first meander is sinusoidal about a center line."[76] After the

---

**71.** *See Aquatex Indus., Inc.*, 419 F.3d at 1382 (citation omitted). As for amendment-based estoppel, there exists "a presumption that the patentee has surrendered, for purposes of the doctrine of equivalents, all subject matter falling between the scope of the original claim and the scope of the claim as amended," if a patent claim was narrowed during prosecution. *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1362 (Fed.Cir.2005). *Accord Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367–69 (Fed.Cir.2003) (en banc) (discussing how presumption of estoppel can be rebutted).

**72.** *Cybor Corp.*, 138 F.3d at 1457.

**73.** *See Medinol II*, 2004 WL 2210290, at *13 (chart summarizing claim construction). Additionally, the parties agreed on definitions for: (1) apices ("[p]oints at the two longitudinal ends of a cell of a stent"); (2) arc ("[a] curved line or segment of a circle"); (3) area of inflection ("[a] portion of a stent element that is bent, i.e., a loop"); (4) disposed apart and generally opposite to ("[s]tructural elements positioned across from and approximately aligned with each other"); (5) disposed between ("[p]ositioned in the space that separates structural elements"); (6) member ("[a] structural element"); and (7) stent ("[a] device made of a body-compatible material, used to widen a blood vessel or other body opening (also called a 'lumen'), and to maintain the resultant size of the blood vessel or lumen"). *See id.* at *5.

**74.** The parties needlessly accuse each other of improperly reopening the claim construction issue. *See* Medinol's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment of Literal Infringement of '120 and '381 Patents and in Opposition to Guidant's Cross–Motion for Summary Judgment of Noninfringement ("Pl. Reply") at 1 (asserting that long after claim construction, "Guidant is still revising its claim construction arguments"); Reply Memorandum in Further Support of Guidant's Motion for Summary Judgment of Noninfringement ("Def. Reply") at 1 ("Medinol fails to grasp that the time for reconsideration on claim construction has long since passed"). These claim construction disputes arose for the first time long after my claim construction Opinion and the conclusion of expert discovery. *See* 6/21/05 Conference Transcript at 2 (the Court: "I get the sense that you want some more work in the claim construction area and both sides seem to want that"); *see also id.* at 4 (statement of Keith Hummel, counsel for Medinol) ("those disputes really didn't arise until we got to the experts' reports, which happened just earlier" in 2005); *id.* at 6–7 (statement of Christine Lehman, counsel for Guidant) (as is "typical in patent cases," remaining claim construction disputes should be handled at same time as infringement motion, instead of construing the terms in isolation).

**75.** *Medinol II*, 2004 WL 2210290, at *6.

**76.** *Id.* Specifically, "[t]he written description states that '[m]eander pattern 11 is a vertical sinusoid having a vertical center line 9.' " *Id.*

close of expert discovery, the parties disputed the meaning of "sinusoidal."[77]

██ As an initial matter, "sinusoidal" in the context of the patents-in-suit must mean something different than the plain meaning of the term, which according to the relevant dictionary is "of, relating to, shaped like, or varying according to a sine curve or sine wave."[78] This conclusion is mandated because the first meanders pictured in Figure 2 of the patents-in-suit (identified explicitly as a "vertical sinusoid") are not sine waves at all, but are squared off at the top of each repeating pattern.[79] Thus, the plain meaning of "sinusoidal" would impermissibly exclude a preferred embodiment from the claim construction.[80] Accordingly, both parties agree that sinusoidal must have a different meaning.[81]

Medinol contends that "a person of ordinary skill in the art would understand 'sinusoidal,' in the context of the Patents-in-Suit, to refer [to] alternating turns."[82] Guidant argues for a narrower meaning, hewing as closely as possible to the dictionary definition quoted above and contending that "sinusoidal" in the context of the patents-in-suit means a pattern exhibiting "(1) constant amplitude, (2) equal distances from one curve [of the meander pattern] to the next, and (3) a single repeating pattern of one up-or-down curve."[83] To arrive at

(quoting '303 Patent, col. 2, ll. 63–64 (referencing Figs. 1–4)). All patents-in-suit share this written description. *See* '120 Patent, col. 3, ll. 1–3; '381 Patent, col. 3, ll. 3–4; '982 Patent, col. 3, ll. 7–8.

77. Medinol had argued at claim construction that the definition of first meander should not include the term "sinusoidal" at all. *See, e.g.,* 9/2/04 *Markman* Hearing Transcript ("*Markman* Tr."), at 44–45 (statement of Dorothy Auth, counsel for Medinol) ("Guidant would like to see meanders [] required to be uniformly distributed. They would like to see first meanders, they must be sinusoids ... [but][t]here is just no disclaimer for that in our specification or in our file history.").

78. Webster's Collegiate Dictionary, Tenth Edition (Merriam–Webster Inc. 1996), *available at* www.m-w.com ("*Merriam–Webster Dictionary*").

79. *See* '120 Patent, Fig. 2; *id.* col. 3, ll. 1–2.

80. *See, e.g., Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298, 1308 (Fed.Cir.2003) (claim construction excluding a preferred embodiment is "rarely, if ever, correct").

81. *See* 6/14/05 Alan Snyder Deposition Transcript ("Snyder Dep. Tr.") at 96, Ex. 44 to 10/28/05 Declaration of Fabian Gonell ("10/28/05 Gonell Decl.") (Medinol's expert stating that "conformance with a mathematical sine wave is not what's meant by sinusoidal."); *see also Markman* Tr. at 107–08 (statement of J. Michael Jakes, counsel for Guidant) (stating that "sinusoidal" as used by the patents-in-suit is not strictly a mathematical sine wave, because the edges of Figure 2 are squared off; "I think [sinusoidal] means it goes up and down in a regular pattern on both sides."). I note that the Snyder transcript has been designated "highly confidential," but the portions of that transcript quoted in this Opinion do not reveal any sensitive information.

82. Pl. Infringement 56.1 ¶ 61. *Accord* Pl. Mem. at 7 (in the stent art, sinusoidal is "well understood to mean a ring with alternating turns."). Medinol contends that Guidant's counsel conceded that Medinol's definition is correct during the *Markman* hearing, when he stated that "sinusoidal" is "not strictly a mathematical sinusoidal wave," and that such a wave "goes up and down in a regular pattern on both sides." *Id.* at 7–8 (quotation omitted). This statement, however, is fully consistent with Guidant's current position, and for that matter with the dictionary definition of sinusoidal, which merely requires that a sinusoidal wave "relate to" a sine wave.

83. Def. Reply at 3. In a pre-motion letter to the Court, Guidant also argued that because the Penta and Vision stents "double back on themselves," they cannot be sinusoidal. *See* 6/14/05 Letter from J. Michael Jakes to the Court at 3 (citing *Medtronic v. Advanced Car-*

this definition, Guidant determined "which characteristics of a sine wave are consistent with the disclosure in Medinol's patents," and then constructed its three-part test.[84] Not surprisingly, the accused products fall within Medinol's proposed definition for sinusoidal.

The intrinsic evidence regarding the meaning of sinusoidal is sparse, as the word "sinusoid" is used only once in the patents-in-suit, in the written description of Figure 2. Indeed, Medinol's expert derived his definition of sinusoidal from a review of the Figures included in the patents-in-suit.[85] Accordingly, the text of the claims, specification and written description is inconclusive.

The only item of prosecution history bearing on the proper construction of "sinusoidal" is a representation made by Medinol that:

> The text [of the related '303 Patent] defines a "meander pattern" as a periodic pattern ... According to the *American Heritage Dictionary of the English Language* (1975), the term "meander" means "circuitous windings or sinuosities (of a stream or path) or a circuitous journey or excursion; a ramble".... Thus, when the specification mentions ... that the term "meander pattern" is a periodic pattern, it means that a meander pattern is a periodic pattern about a center line.[86]

Guidant asserts that this statement is a concession by Medinol that a first meander must be shaped like a sinusoid, which in turn should be defined as a pattern exhibiting characteristics of a sine wave consistent with the disclosures of the patents-in-suit. But Guidant places far more weight on this statement than it can bear. In fact, this statement supports Medinol's position, because it indicates the patentee's understanding that "sinuosity" *in this context* means something more expansive than simply a pattern resembling a sine wave. In particular, this definition of meander reveals that Medinol took it to mean "circuitous windings *or* sinuosities," indicating that the definition is not limited to sinuosi-

---

diovascular Sys. Inc., 182 F.Supp.2d 810, 822–23 (D.Minn.2000), where the Court: (1) adopted parties' agreed construction of "generally sinusoidal in shape" to mean "[a] further description of the zig-zag shape. The shape does not come to sharp angles, but is more the shape of the mathematical sine wave"; and (2) found that Multi–Link stents did not literally infringe because the ring patterns doubled back on themselves). However, Guidant did not pursue this argument in its motion. *See* Def. Reply at 3 n. 3.

84. Def. Reply at 2.

85. *See* Snyder Dep. Tr. at 74–75:
 Q. What is the basis for your opinion that sinusoidal means alternating loops facing in opposite directions?
 A. .... I start with the Court's definition that the first meander is a periodic sinusoidal pattern about a center line, and I start out by saying periodic means

the pattern ... must repeat, and sinusoidal is, from the dictionary, means of or relating to or shaped like of varying [sic] according to a sine curve or sine wave. Then from the examples in the patent we learn that ... sinusoidal here can't mean a mathematical sine wave, you can't take the mathematical, it has to be a sine, a pure sine function, because the examples in the patent which are square waves ... but what's common in all cases is a series of alternating loops with no intervening material, basically a pattern that wiggles back and forth ... from periodic, I get the additional requirement that as the pattern wiggles back and forth, whatever wiggles, you have whatever alternating loops you have going down, whatever the shapes of those loops are needs to repeat with regularity.

86. Preliminary Amendment filed with the PTO by Medinol on May 31, 1995 ("Medinol PTO Statement") at 4, Ex. 7 to Shaffer Decl.

**300**

ties.[87] The statement further explains that a meander can "ramble" which is far from a mathematical sinusoidal structure.[88]

More generally, while Guidant's definition is elegant and better grounded in the dictionary definition of "sinusoidal,"[89] it does not account for the fact that Medinol's patents are not limited, by the prosecution history or any other intrinsic evidence, to rings exhibiting the particular characteristics of sine waves selected by Guidant.[90] Moreover, Guidant's proposed definition for "sinusoidal" would render superfluous the terms "periodic pattern" and "about a center line" in the Court's construction of first meanders. Any ring structure meeting Guidant's three criteria would necessarily be a periodic pattern about a center line. At the same time, Guidant is incorrect when it argues that Medinol's definition of sinusoidal fails to take account of the difference between the construction of "first meander" and "second meander."[91] It is entirely possible for there to be a "periodic pattern about a center line" that does not also have "alternating turns."[92] For example, the second meanders disclosed in Figure 5 of the Lau Patent,[93] exhibit a repeating pattern, but also include straight elements (the straight connectors of Lau), and therefore those second meanders do not consist of alternating turns.

■■■ I note, however, that Medinol's contention that Guidant's definition of sinusoidal would exclude a preferred embodiment of the patents-in-suit is meritless. Medinol relies on an alleged small deviation in the distance between loops in Figure 2 of the '120 Patent to argue that the patents-in-suit do not display "equal distances from one curve to the next," as required by Guidant's proposed definition

87. *Id.* at 4 (emphasis added).

88. *See id.*

89. I do note, however, that Guidant's definition, relying as it does on first meander patterns being "curved," runs the risk of excluding the preferred embodiment depicted in Figure 2 of the patents-in-suit, given that "curved" means "to have or take a turn, change, or deviation from a straight line or plane surface without sharp breaks or angularity." *Merriam–Webster Dictionary.*

90. *See, e.g., Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1302 (Fed.Cir. 2004) (citing *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 905–07 (Fed.Cir.2004)) (claim terms not restricted to scope of preferred embodiments unless the patent's written description expressly or by clear implication restricts the scope of the invention to the preferred embodiments).

Guidant attempts to demonstrate the all-encompassing nature of Medinol's proposed definition by presenting a seemingly random, squiggly pattern that is, according to Medinol's expert, technically a periodic sinusoidal pattern about a center line. *See* Def. Mem. at 12 (citing Snyder Dep. Ex. 7). But Medinol is correct that claim terms must be considered in context of the claim as a whole. *See* Pl. Reply at 8 (citing *Phillips,* 415 F.3d at 1314). Similarly, even if Guidant's hypothetical pattern qualified as a first meander, every asserted meander claim contains additional limitations, which means that a broad definition of first meander, by itself, would not mean that the patentee had violated its duty to inform the public as to the scope of its invention.

91. Def. Mem. at 11.

92. The exclusion of the word "sinusoidal" from the definition of second meanders means only that second meanders can, but need not, be sinusoidal. *See* Pl. Reply at 8 n. 5 ("thus, 'periodic' requires that the meander have a repeating pattern and 'sinusoidal' requires that the repeating pattern be of alternating turns").

93. Guidant has asserted in this case that "the Lau Patent discloses a 'second meander.' " Rule 56.1 Statement of Undisputed Facts in

of sinusoidal.[94] This reliance is misplaced. There is no indication in the specification of the patents-in-suit that the alleged variations in Figure 2 result from any intent that the loops of the design be spaced unevenly.[95] Indeed, Figure 5A of the patents-in-suit, illustrating a close-up diagram of the same first meander pattern, clearly discloses that the distances between each loop in the pattern are meant to be equal.[96]

Given the intrinsic evidence, there is no real need to examine the extrinsic evidence cited by the parties.[97] Nonetheless, I note that Medinol's extrinsic evidence in support of its definition misses the mark. Medinol points to usage of the terms "sinusoidal" or "sinusoid-like" by Guidant in relation to other products, as well as in third-party patents, that Medinol asserts is consistent with Medinol's definition of the term. Because this evidence post-dates 1994, the relevant date for purposes of determining the meaning of sinusoidal, it is irrelevant for the purpose of claim construction.[98]

In sum, Medinol's proposed definition is more consistent with the prosecution history and my previous Opinion. Accordingly, "sinusoidal" is defined as a "series of alternating turns with no intervening material."

**2. "About a Center Line"**

The parties also disagree as to the definition of "about a center line," another term used by the Court in construing "meander." Guidant asserts that "about a center line" means there must be the same amount of stent elements on either side of the line. By contrast, Medinol argues that " '[a]bout a center line' means that the meander is oriented in a straight line, with repeating elements on either side of the straight line being the same distance from the line on each cycle."[99] But Medinol's definition cannot be correct because it is simply a long-winded way of saying "periodic."[100] Medinol's expert essentially admitted this at his deposition.[101] For this

Support of Guidant's Motion for Summary Judgment of Invalidity ¶ 71.

**94.** *See* Pl. Mem. at 9; Pl. Reply at 4–5 (citation omitted).

**95.** " 'Patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.' " *Nystrom v. TREX Co.*, 424 F.3d 1136, 1149 (Fed.Cir.2005) (quoting *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Ltd.*, 222 F.3d 951, 956 (Fed.Cir.2000)).

**96.** *See* '120 Patent, Fig. 5. The patents-in-suit specifically state that Figures 1–5 are meant to depict the same stent. *See, e.g., id.* col. 2, ll. 28–39.

**97.** *See, e.g., Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 832 (Fed.Cir.2003) (extrinsic evidence need not be considered when intrinsic evidence is sufficient to construe a claim term).

**98.** *See, e.g.,* Pl. Infringement 56.1 ¶ 58 (discussing a patent with an application filing date of September 3, 1999); *id.* ¶ 59 (discussing patents with filing dates of 1998 and 2000); *id.* ¶ 60 (discussing a patent with filing date of July 31, 2002).

**99.** Pl. Mem. at 14–15.

**100.** *See* Def. Reply at 5 ("By definition, a 'periodic pattern' has 'repeating elements on either side of the line being the same distance from that line' ").

**101.** *See* Snyder Dep. Tr. at 106, Ex. 5 to Shaffer Decl.:

Q: "[What does about a center line mean?"]
A: In my opening report ... I explain that about a center line means that each repeating feature is at a fixed distance from the center line on each cycle.
Q: Is that different than periodic?
A: Well, we have already been through this ... I say the pattern is periodic because it repeats about a center line. Now, where is the center line? ... [e]ach

reason alone, Medinol's proffered definition must be rejected.

At claim construction, Guidant argued for the inclusion of the words "uniformly distributed" in the definition of first meander, "arguing that the ordinary meaning of 'center line' is a 'real or imaginary line that is equidistant from the surface or sides of something.' "[102] I rejected that argument, but held that: "the phrase 'about a center line' requires that the meander pattern be uniformly distributed about the line. But the meaning of 'uniformly distributed' is adequately captured by the words 'center line.' To use both 'uniformly distributed' and 'center line' would be needlessly redundant."[103] Thus, the phrase "uniformly distributed" is already incorporated into the definition of both first and second meander. Moreover, at claim construction I declined to adopt Medinol's suggestion, repeated here, that meander patterns merely be *oriented* about a center line."[104]

Medinol argues that Guidant's definition would exclude two preferred embodiments of the patents-in-suit, namely Figures 2 and 7. Medinol is wrong as to both. While Medinol points to a center line in Figure 2 that appears to place unequal amounts of stent material on either side of the line, there is no indication in the written description that this was intentional. A

court cannot rely on what could simply be a poor drawing.[105] Moreover, Guidant correctly notes that accepting Medinol's argument regarding Figure 2 would mean that Figure 2 does not meet Medinol's own definition of center line, which requires that " 'repeating elements on either side of the line [be] the same distance from that line.' "[106]

Regarding Figure 7, Medinol contends that "[u]nder Guidant's definition, a longitudinal structure extending over an odd number of cells in a Figure 7–like stent can never be a 'meander,' because there will always be more loops on one side of the line."[107] But Medinol ignores the fact that Figure 7 is not intended to depict an entire stent, so the fact that there are an unequal number of loops on either side of Figure 7's center line is of no consequence.[108] Even if Figure 7's pattern were used throughout an entire stent, Guidant's definition can be refined to require that the elements of the stent be uniformly distributed *on each periodic cycle.*

Finally, Medinol asserts that its definition of "about a center line" is established by a PTO examiner's drawing, during prosecution, of a center line on a putative second meander pattern of the Burmeister application, a prior art stent design.[109]

---

figure is a fixed distance from its center line on each cycle.

**102.** *Medinol II*, 2004 WL 2210290, at *6 n. 73 (citation omitted).

**103.** *Id.*

**104.** *See id.* at *5 n. 64 (quotation and citation omitted).

**105.** *See Nystrom*, 424 F.3d at 1149 (citation omitted) (a court should not rely purely on drawings to gauge proportions between elements). Indeed, I note that the *other* center line depicted in Figure 2 does appear to leave equal amounts of stent material on either side of the center line.

**106.** Def. Reply at 6 n. 5 (quoting Pl. Reply at 11).

**107.** Pl. Reply at 10 (citing Medinol PTO Statement at 5, where Medinol stated that the length of a stent "can be changed by removing or adding *a* row of cells") (emphasis added).

**108.** *See, e.g.,* '120 Patent, col. 2, ll. 43–44 ("FIG. 7 is an illustration of a third embodiment of the *pattern* for the stent") (emphasis added).

**109.** *See* Pl. Mem. at 14. The Burmeister application, filed in 1994 and then abandoned, was discussed in *Medinol III*, 412 F.Supp.2d at 306 – 307, 324, 2005 WL 3535062, at **2–

But it is unclear why a drawing made years before my claim construction in this case should override the plain meaning of the patents-in-suit and the intrinsic evidence before this Court.

For these reasons, I conclude that "about a center line" means that the stent elements must be uniformly distributed about a center line on each periodic cycle. This is consistent with the plain meaning of "center line."[110]

### 3. "Loop"

 I have construed "loop" to mean "a C or U-shaped structure."[111] The presence of such a loop is required by all asserted claims. Guidant argued in a letter preceding its motion that the Penta does not infringe these claims because its Access–Link is actually a five-turn "S-shaped" structure.[112] However, Guidant does not make this argument in its motion.[113]

In any case, Guidant's argument is at odds with the clear language of my claim construction and the asserted claims themselves. *First,* Medinol is correct that the phrase "C or U-shaped structure" does not by its terms exclude C or U-shapes that happen to be part of an S-shape.[114] *Second,* the claims themselves only require that there be *at least* one loop between consecutive first meanders, clearly contemplating that there may be instances where there is more than one loop between first meanders of a stent based on the patents-in-suit. For these reasons, the Penta's Access–Links constitute "loops" for the purpose of these motions.[115]

### 4. "Rigid"

 I construed the term "flexible cell" (relevant to the asserted claims of the '381 Patent) to mean "[a]n arrangement of structural elements that defines an enclosed space. The cells must be substantially flexible prior to expansion of the stent and substantially *rigid* after expansion of the stent."[116] The term "rigid" can refer to two different attributes of a stent, and the parties disagree about which attribute is necessary under my claim con-

---

3, 12. This drawing shows that the PTO examiner's center line leaves a much larger portion of the Burmeister application's putative second meander pattern below the line than above the line. *See* Pl. Noninfringement ¶ 65.

110. "Centerline" is defined as "A real or imaginary line that is equidistant from the surface or sides of something." *Merriam–Webster Dictionary. Accord* Webster's Ninth New Collegiate Dictionary (1991) (same).

111. *Medinol II,* 2004 WL 2210290, at *13.

112. *See* 6/17/05 Letter from J. Michael Jakes to the Court at 3.

113. *See, e.g., Dineen ex rel Dineen v. Stramka,* 228 F.Supp.2d 447, 454 (S.D.N.Y.2002) (plaintiff's argument deemed abandoned when not addressed in opposition brief to summary judgment)

114. *See* Pl. Mem. at 16 (citing *Medinol II,* 2004 WL 2210290, at **6, 13).

115. Guidant asserts in its responses to Medinol's 56.1 statement that during prosecution, Medinol disclaimed a multiple-turn structure as being different from the claimed "loop." Def. Infringement 56.1 ¶¶ 183, 238 (citing *Medinol II,* 2004 WL 2210290, at *6). However, as discussed in *Medinol II,* the "loops" of the patents-in-suit were only differentiated from the "kinks" or S-shaped curves in the predecessor '373 patent, as opposed to being different than all multiple-turn structures. *See Medinol II,* 2004 WL 2210290, at *6 (citing '373 Patent, col. 4, ll. 63–68; *see also id.* Figs. 3A, 3B, 3C). Guidant calls its five-turn Access–Link an S-shaped structure, but in reality the Access–Link is merely a series of adjacent U-shaped structures falling within this Court's construction of "loop."

116. *Medinol II,* 2004 WL 2210290, at *9 (emphasis added).

struction.[117] Medinol contends that "rigid" refers to radial support—that is, the capacity of the stent to support the vessel wall after deployment. Guidant contends, however, that both "rigid" and "flexible" refer to longitudinal flexibility, and so "rigid" in this context means the opposite of "flexible." As the accused products, unlike the patents-in-suit, are designed to maintain longitudinal flexibility even after expansion and deployment (so as to avoid straightening blood vessels), Guidant asserts that its interpretation of "rigid" compels the conclusion that the accused products do not have "flexible cells," and thus do not infringe the '381 Patent.

The term "rigidity" is used twice in the text of the patents-in-suit. Most notably, the specification discloses that:

It will be appreciated that the two orthogonal meander patterns 11 and 12 and the compensation they provide to each other provides flexibility to the unexpanded stent of FIG. 1. However, *when the stent is expanded, the changes in each of loops 14 and 16 provide rigidity to the resultant stent and thus, enable the stent to maintain a blood vessel at a desired inner diameter.*[118]

Both parties point to this passage as support for their interpretation of my construction of rigid.[119] But the only sensible reading of this passage, given the usage of "thus," is that "rigidity" is intended to relate to the ability of the stent to hold open the vessel. In other words, the specification clearly connects the concept of "rigidity" to the stent's purpose of maintaining proper scaffolding of the artery once deployed.

To be sure, the patents-in-suit use "rigid" in a different sense when describing the prior art Palmaz and Schatz stent designs, which the patents-in-suit describe as follows: "[s]ince [their] tubular grafts are *relatively rigid,* the flexible connectors are needed so that the stents can bend when being fed through a curved blood vessel."[120] However, the limited point made by this quotation, which does not contradict the specification's description of the invention, is that some prior art designs tended to be inflexible prior to expansion. The Palmaz designs, in particular, were well-known in the stent art to be relatively inflexible before expansion, which was one of the concerns the patents-in-suit sought to address in the first place.[121]

The prosecution history relied upon by Guidant does not support its position. Guidant asserts that "Medinol overcame a rejection to the prior art Pinchasik '373 Patent arguing that the 'present invention'—unlike the 'rigid' prior art articulated stent design—was 'uniformly flexible' prior to expansion.... By contrasting flexible and rigid as essentially opposing

---

117. Among the dictionary definitions of "rigid" are: (1) deficient in or devoid of flexibility; and (2) appearing stiff and unyielding. *See Merriam–Webster Dictionary.*

118. '381 Patent, col. 4, ll. 26–30 (emphasis added). The other two patents-in-suit contain the identical passage—thus, all citations to the '381 Patent in this section apply equally to the '120 and '982 Patents.

119. *See* Pl. Mem. at 20 ("thus, the Patents–in–Suit teach that, on expansion, the first meanders [of which the loops 14 and 16 referenced in the patent are a part] become more resis-

tant to radial compression (i.e., more radially rigid) as they open, enabling the stent to provide good support"); Def. Mem. at 19–20 ("the critical point Medinol misses—as the transition [word however] used in the specification [makes] clear—is that when the stent expands, there is a definite transformation from a flexible state to an inflexible state").

120. '381 Patent, col. 1, ll. 43–46 (emphasis added).

121. *See Medinol III,* 412 F.Supp.2d at 308–310, 2005 WL 3535062, at \*\*3–4 (citation omitted).

qualities, Medinol made it quite clear its use of the term rigid meant the opposite of flexible."[122] However, the prosecution history cited by Guidant merely shows that Medinol distinguished the patents-in-suit from the '373 Patent's *pre-deployment* rigidity.[123] The '373 Patent, unlike the patents-in-suit, is an "articulated" stent design that can be bent pre-deployment only at certain intervals where connectors hold together "rigid" lengths of stent.[124] In fact, the statements from the prosecution history cited by Guidant all relate to *pre-deployment* flexibility.[125]

Finally, Medinol's position is consistent with the stated goal of the patents-in-suit.

As I have already noted, the chronic problem with early stent designs, which the patents-in-suit sought to address, is that there was an unfortunate trade-off between pre-deployment flexibility and post-deployment radial strength.[126] A stent could be flexible yet do a poor job of holding open a vessel once deployed, or it could be strong once deployed yet hard to maneuver through a blood vessel. The whole purpose of the patents-in-suit was to be flexible pre-deployment yet radially strong post-deployment. Thus, whether a stent based on the patents-in-suit is flexible or inflexible *after* deployment is largely beside the point.[127] Accordingly, Guidant's

122. Def. Mem. at 19.

123. During prosecution, Medinol asserted that:

The '373 patent is directed to an articulated stent which includes at least two *substantially rigid* segments and a flexible connector disposed between the *substantially* rigid segments for connecting adjacent rigid segments of the articulated stent. Thus, the '373 patent discloses an articulated stent that is comprised of at least three distinct portions and does not disclose the meander patterns of the claimed invention, their cooperative relationship, or the flexible structure disclosed and claimed by Applicants. Furthermore, the articulated stent disclosed in the '373 patent is flexible only at the articulation points where the connectors connect the substantially rigid segments. In contrast, the Applicant's invention and the pending claims are directed to a flexible expandable stent whose unique meander patterns and structure define a plurality of flexible expandable cells that are substantially flexible prior to expansion of the stent and substantially rigid after expansion of the stent that permit the stent to be substantially uniformly flexible along its entire length prior to expansion of the stent.
Excerpts from the Prosecution History of the '120 Patent at 8, Ex. 8 to Shaffer Decl. (emphasis added).

124. *See*, '373 Patent, Title Page (patent entitled "ARTICULATED STENT"); *id.* col. 2, ll.

16–22 ("The objective of the present invention is achieved by an articulated stent, comprising: (a) at least two substantially rigid segments; and (b) a flexible connector for connecting adjacent segments, wherein the connector assumes a substantially cylindrical configuration when relaxed and a differentially stretched and compressed curved configuration when flexed.").

125. *See, e.g.,* Medinol PTO Statement at 5 ("The stent of the present invention is flexible in two directions, throughout its body, rather than having rigid areas and flexible areas as in the stents of the prior art. This flexibility enables it to bend anywhere along its length and to expand without significantly changing its length. In addition, because the structure of the stent is generally uniform, the flexibility is present generally throughout the structure, a fact which enables it to bend at all locations throughout the structure.").

126. *See Medinol III,* 412 F.Supp.2d at 301– 307, 310, 2005 WL 3535062, at \*\*1–2, 4 (citation omitted); *Medinol II,* 2004 WL 2210290, at \*2 (citation omitted).

127. Although a court should not compare the accused products and a *commercial embodiment* of an asserted patent, *see, e.g., Glaxo, Inc. v. TorPharm, Inc.,* 153 F.3d 1366, 1373 (Fed.Cir.1998), I note that the chapter on the NIR and NIRFLEX Stents, co-authored by Richter and cited by Guidant, states that once the stent is deployed, "the stent loses its flexi-

interpretation of "substantially flexible prior to expansion of the stent and substantially rigid after expansion of the stent" would, in effect, construe the patents-in-suit as teaching an attribute (post-deployment *inflexibility* ) unrelated to their stated purpose.[128]

Because the intrinsic evidence establishes the proper definition of "rigid" in this context, there is no need to turn to extrinsic evidence to construe "rigid."[129] In any case, the extrinsic evidence presented by the parties is largely irrelevant. Both parties collect various statements made by Medinol and Guidant employees, retained experts and third-party patents

purporting to establish that their opponent has conceded the proper construction of "rigid."[130] These collected statements prove nothing. As already demonstrated, "rigid" in the context of stent technology can be used in two senses—pre-deployment, it means the opposite of "flexible," and post-deployment (at least as used by the patents-in-suit), rigid refers to the ability of the stent to hold open a blood vessel.[131] The various uses of "rigid," "rigidity," or "radial rigidity" cited by the parties cannot be divorced from the contexts in which those statements were made, and thus they shed no particular light on the proper meaning of "rigid" as used in the patents-in-suit.[132]

---

bility, but this lost feature is no longer important since the stent is not required to move anywhere." Jacob Richter et al., *The NIR and NIRFLEX Coronary Stents,* in *Handbook of Coronary Stents* 217 (4th ed., Patrick Serruys and Benno Rensing eds.) 2002, Ex. 10 to Shaffer Decl. *See also* BSC Trial Testimony at 73–76 ("Flexibility . . . is needed when you are trying to track it through the curviness of the artery. But once you get to the position, you don't need it. The strength or the rigid support of this stent is needed after you deployed it, but not when it is crimped on the balloon.").

128. Guidant asserts that Medinol missed the boat with its lack of concern with post-deployment flexibility. *See* Def. Mem. at 20 (citation omitted) ("In 1999 . . . Medinol finally realized what Guidant had known all along—that a flexible, and not a rigid or inflexible stent after expansion led to better overall stent performance and thus, improved patient outcomes."); Def. Noninfringement 56.1 ¶ 71 (Richter discussing physician complaints regarding the post-deployment inflexibility of Medinol stents: "some could refer to it as straightening of vessel, some could refer to it as making it more rigid longitudinally") *see also supra* note 37. While Guidant may be correct, this point is not relevant to the literal infringement inquiry.

129. *See Vitronics Corp.,* 90 F.3d at 1583 ("Resort to extrinsic evidence is appropriate only when an ambiguity remains after consulting the intrinsic evidence of record.").

130. For example, Guidant collects various statements made by Richter, as well as Medinol's experts during depositions, purporting to be "highlights" of the many instances "where Medinol has used the term 'rigid' to mean inflexible or stiff." Def. Mem. at 21 (citation omitted). By contrast, Medinol catalogs an assortment of stent patents, belonging to Guidant as well as third parties, purporting to use "rigid" to mean radial support. *See* Pl. Infringement 56.1 ¶¶ 73–76 (citation omitted).

131. This is well illustrated by Richter's testimony at the *Markman* hearing. When describing the Palmaz stent, he used "rigidity" in both senses within the span of three sentences, but at the same time he clearly distinguished the different usages: "the support, the rigidity of the vessel wall was very good. The problem with that . . . it is *totally inflexible, totally rigid* . . . if you have a very tortuous vessel you will not be able to push it through to the target. So [the Palmaz stent] had good support, *good rigidity for support."* *Markman* Tr. at 11 (Richter) (emphasis added).

132. For example, Guidant correctly notes that much of Medinol's evidence actually employs a different term, *"radial* rigidity," to refer to radial strength. *See* Def. Reply at 8–9 ("Guidant does not dispute that 'rigidity,' when modified by 'radial,' relates to 'radial strength.' But . . . when used alone, rigid simply means inflexible."). However, it does not follow that Medinol is precluded from

In sum, based on the intrinsic evidence Medinol's interpretation of "flexible cell" is correct.[133] Accordingly, "rigid" as used in my construction of "flexible cell" means "able to hold open the blood vessel at the desired inner diameter."

### B. Literal Infringement

Now that the Court has completed its final claim construction, the next question is whether the accused products literally infringe Medinol's patents.[134]

### 1. Meander Claims—'120 Patent

■ The rings and links of the accused products comprise a "periodic pattern,"

but as already described the stent elements are not uniformly distributed about a center line on each periodic cycle.[135] For this reason, the accused products do not include either first or second meanders as defined by this Court's claim construction. Indeed, Medinol concedes this, at least with regard to the putative second meanders of the accused products.[136] Because every asserted claim of the '120 Patent requires a first and second meander, Guidant is entitled to summary judgment as to literal infringement of that patent.

### 2. Flexible Cell Claims—'381 Pat-

---

using "rigidity" in its own patents, without the adjective, to convey the same concept. Moreover, many, if not all, of the statements made by Medinol officials or experts, purportedly establishing that rigidity refers to post-deployment inflexibility, show no such thing when read in context. *See, e.g.,* BSC Trial Testimony at 73 (Richter testifying that, inter alia, "the strength or the *rigid support* of this stent is needed *after you deployed it*"); Sherman Dep. Tr. at 127–29 (describing the Palmaz stent as longitudinally rigid *before deployment*); *see also supra* note 127 (quotation from Richter's chapter in the Coronary Stent Handbook, clearly indicating that "rigidity" in relation to the NIR stent was meant in terms of vessel wall support post-deployment).

**133.** Because it is based on a false premise as to the relevant meaning of "rigid," I do not reach Guidant's argument that infringement of the flexible cell claims is determined by comparing a stent's pre-expansion longitudinal flexibility with its post-expansion longitudinal flexibility. *See* Def. Mem. at 22–24.

**134.** Medinol concedes that the accused products do not literally infringe the asserted meander claims of the '982 Patent. "The asserted claims of the '982 Patent require that, in the expanded state, the stent 'consist[] of,' inter alia, 'first' and 'second' meander patterns. Thus, with respect to those claims, the entire stent must be made up of [ ] meander patterns. The Small Vision and Penta stents each have minor variations at the end of the

stent, and, accordingly, do not literally have second meanders that extend the entire length of the stent." Pl. Reply at 23 n. 14 (referring to '982 Patent, claim 1).

**135.** *See supra* Part IV.A.2. Guidant correctly notes "the Penta and Vision stents have more (and different) stent elements or material on one side of the center line than on the other . . . [i]n other words, there is no uniform distribution of the rings from one side of the center line to the other." Def. Reply at 6 (citation omitted). *See also* Def. Mem. at 9, 13–15 (depicting the fact that the rings and links of both the Penta and Vision stents have more and different stent material on either side of the center line for both the putative first and second meanders).

**136.** *See* Pl. Noninfringement ¶¶ 65–67 (not disputing that, in each periodic cycle of the accused products' putative second meanders, there is an unequal amount of stent material on each side of the center line). Medinol does dispute that the rings (i.e. putative first meanders) of the accused products have unequal amounts of stent elements on either side of the center line. *See id.* ¶¶ 57–59, 61. However, the accused products indisputably have *different* stent elements on either side of the center line, and even assuming *arguendo* that the stent elements that make up the accused products' rings are uniformly distributed about a center line, it would not change the infringement analysis due to Medinol's concession regarding second meanders.

ent[137]

■ By its own admission, Guidant's opposition to a finding of literal infringement of the "flexible cell" claims of the '381 Patent is mostly premised on its interpretation of my claim construction of "flexible cell," which I have now rejected.[138] Specifically, Guidant asserts that the accused products do not have flexible cells purely because of its argument that "substantially rigid after expansion" refers to post-expansion inflexibility, a feature distinguishing the accused products from the teachings of the patents-in-suit.[139] But as I discussed above, the intrinsic evidence establishes that "substantially rigid after expansion" refers to the ability of the stent to hold open the blood vessel in which it is deployed, and Guidant does not dispute that the accused products qualify as "substantially rigid after expansion" under that definition.[140]

■ Guidant raises two additional issues with regard to literal infringement of the '381 Patent, relating to a total of four claims.[141] Guidant contends that the accused products do not meet the limitations of claims 57 and 66 of the '381 Patent, which require, inter alia, that "in the unexpanded state, a radial plane perpendicular to a longitudinal axis can pass through the flexible links of the flexible cells and not pass through the circumferential members."[142] Specifically, Guidant contends that: (1) "the alleged radial plane does not pass through the five-turn 'Access–Link' of the Penta stent, or the 'Flexalink' of the Vision stent"; and (2) the diagrams relied on by Medinol to demonstrate that this limitation is met are not depictions of the accused products in their *unexpanded* state.[143]

Guidant is wrong on both counts. *First*, a flexible link is defined as "a structural element connecting adjacent cells that is flexible and aligned with respect to the stent's longitudinal axis." Therefore, to the extent that Guidant argues that the radial plane must pass through *the five-turn loops* of the Access–Link, or the *loop* of the Flexalink, it is mistaken. The entire connector of the accused products qualifies as a flexible link, not just the looped portion.

*Second*, Medinol relies on Guidant's own depictions of the Penta and Vision stents to demonstrate that the "radial plane" limitation of claims 57 and 66 is met by the accused products.[144] Although disputed by Guidant, Medinol's reliance on these depictions supports its assertion of literal

137. Although the patents-in-suit are all continuations of the application that became the '373 Patent, the '381 Patent does not include the "meander" claims of the '120 and '982 Patents.

138. *See* Def. Infringement 56.1 ¶¶ 77–160 (with two exceptions, discussed below, all of Guidant's responses to Medinol's Rule 56.1 statement regarding infringement of the '381 Patent relate to interpretation of flexible cell).

139. *See, e.g.,* Def. Mem. at 1 ("the Penta and Vision stents do not have 'flexible cells' because they remain flexible after expansion and, thus, cannot be considered 'rigid after expansion' as the claims require.").

140. *See supra* Part IV.A.4.

141. These issues are not raised in Guidant's memoranda of law, but only in its responses to Medinol's 56.1 statement.

142. '381 Patent, claim 57; *id.* claim 66 (same).

143. Def. Infringement 56.1 ¶¶ 130–32 (disputing that this limitation is met).

144. *See* Pl. Infringement 56.1 ¶¶ 130–32 (citing Guidant-supplied depictions of the Penta and Vision patterns, Ex. 3 to 9/14/05 Gonell Decl.); *see also* Pl. Reply at 17 (representing that the patterns cited above are "Guidant's own internal diagrams of as-manufactured (i.e. unexpanded) Penta and Vision stents").

infringement. While these depictions (Gonell Ex. 3) are not explicitly labeled as pre-expansion depictions of the accused products, other documents produced by Guidant and cited by Medinol, clearly labeled as depictions of post-expansion stents, reveal that Exhibit 3 does in fact depict the *pre-expansion* stents.[145]

Guidant also misreads claims 58 and 69 of the '381 Patent, which require that ends of a flexible link be "generally aligned with ... each other along a longitudinal axis of the stent." The accused products clearly meet this limitation, and Guidant's misinterpretation of these claims to require that the ends of *adjoining* links be aligned with each other along the longitudinal axis[146] would (among other problems) exclude the preferred embodiment depicted in Figure 8, as Medinol demonstrates.[147]

The Court's construction of the '381 Patent leads to the inexorable conclusion that the accused products literally infringe that patent. Thus, Medinol's motion for summary judgment as to the '381 Patent is granted.

## C. Doctrine of Equivalents

Although Medinol asserts that the accused products infringe the patents-in-suit

under the doctrine of equivalents, its present motion is confined to literal infringement of the '120 and '381 Patents. However, as part of its noninfringement cross-motion, Guidant asserts that substantial differences between the accused products and the patents-in-suit preclude a finding of infringement under the doctrine of equivalents.[148] Because I have found the '381 Patent to be literally infringed, I only consider the doctrine of equivalents with respect to the "meander" claims of the '120 and '982 Patents.[149]

■■■ Guidant first argues that Medinol's doctrine of equivalents claims are barred by argument-based estoppel. During prosecution, Medinol explained to the PTO that "when the specification mentions ... that the term 'meander pattern' is a periodic pattern, it meant that a meander pattern is a periodic pattern *about a center line.*"[150] Thus, according to Guidant, "Medinol cannot now claim that the patterns found in the Penta and Vision stents that are not periodic about a center line are equivalent to simply a periodic pattern."[151]

In response, Medinol argues that its statement to the PTO was made to clarify

---

145. *See* "Stent drawings and photographs produced in electronic form by Guidant from its files," Ex. 4 to 9/14/05 Gonell Decl. at Fig. 3 (photograph of expanded Penta stent, clearly showing that both the rings and links of the stent are far more elongated than they appear in Exhibit 3 cited *supra* at note 144); *id.* at Figs. 4–5 (photograph of expanded Vision stent, clearly showing that both the rings and links of the stent are far more elongated than they appear in Exhibit 3).

146. *See* Def. Infringement 56.1 ¶¶ 139–41.

147. *See, e.g.,* '120 Patent, Fig. 8; *see also* Pl. Reply at 17 (demonstrating how Guidant's interpretation runs afoul of Figure 8's depiction).

148. *See* Def. Mem. at 15–18, 24.

149. *See Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 828–29 (Fed.Cir. 1984) (citation omitted) ("[t]he doctrine of equivalents only comes into play when there is no literal infringement."). Thus, I need not consider the parties' evidence concerning the flexibility of the accused products, *see* Def. Mem. at 22–25 (citation omitted); Pl. Reply at 23–25 (citation omitted).

150. Medinol PTO Statement at 4 (emphasis added).

151. Def. Mem. at 16. I need not reach Guidant's second estoppel argument, which relies on Medinol's having distinguished the patents-in-suit from the prior art Lau Patent on the grounds that Lau, unlike the patents-in-suit, uses "occasionally interconnected" rings that do not constitute a second meander pat-

**310**

certain claims, rather than to distinguish the Lau and Palmaz patents.[152] The relevant inquiry, however, founded in the public notice function of patent law, is not focused on the patentee's intent, but on "whether a competitor would reasonably believe that the applicant has surrendered the relevant subject matter."[153] In clarifying its claims, Medinol made an unequivocal statement that it did not seek to patent a meander pattern that was not "about a center line." Accordingly, estoppel must apply, and the accused products do not utilize patterns equivalent to Medinol's meander patterns, because the stent material of the accused products is not uniformly distributed about a center line. Thus, Guidant is entitled to a summary judgment of noninfringement as to the '120 and '982 Patents.[154]

## V. CONCLUSION

For the foregoing reasons, a summary judgment of infringement is granted in favor of Medinol as to the '381 Patent and denied as to the '120 Patent; and Guidant's cross-motion for a summary judgment of noninfringement is granted as to the '120 and '982 Patents, but not as to the '381 Patent. The Clerk of the Court is directed to close the pending motions [numbers 69 and 83 on the docket sheet]. A conference is scheduled for Monday, March 6 at 5:00 P.M. in Courtroom 15C. At this conference, the parties should be prepared to discuss when and how to proceed on Guidant's counterclaim for a declaratory judgment of patent invalidity.

SO ORDERED:

---

tern. *See* Medinol PTO Statement at 6. Thus, according to Guidant, as "the connectors of the Penta and Vision are also 'occasionally interconnected' in exactly the same manner described in Lau," Medinol is estopped from arguing that the accused products form the equivalent of second meanders. Def. Mem. at 16.

**152.** *See* Pl. Reply at 19–20.

**153.** *Cybor Corp.,* 138 F.3d at 1457. *Accord Spectrum Int'l, Inc. v. Sterilite Corp.,* 164 F.3d 1372, 1378–79 (Fed.Cir.1998) (citation omit-

ted) (it "makes sense" to narrow claim interpretations according to explicit statements made during prosecution, as "the public has a right to rely on such definitive statements").

**154.** Because Guidant has prevailed on argument-based estoppel grounds, I do not reach the parties' substantive arguments as to whether the accused products are in fact equivalent to the patents-in-suit. *See* Pl. Noninfringement 56.1 ¶¶ 116–31; Def. Mem. at 16–18.